Mary Ellen STROTHER and Harold David Strother, natural guardians of Harold David Strother, Jr., a minor child, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 88–32 V.

United States Claims Court.

Aug. 14, 1990.

Gregory P. Farrar, Pensacola, Fla., for petitioners.

Barbara Hudson, Rockville, Md., with whom were Stuart E. Schiffer, Acting Asst. Atty. Gen., and John Lodge Euler, Deputy Director, Washington, D.C., for respondent.

## OPINION AND ORDER [1]

RADER, Judge.

In this action under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa–1 (Supp. V 1987) (the Act), petitioners seek compensation for injuries to Harold David Strother (David). On August 9, 1984, Dr. Charles Benton administered a measles vaccine to David. On August 11, 13, 15, and again on August 17, Mrs. Strother brought David back to Dr. C. Benton with a fever, an ear infection, a rash, and other maladies. When Mrs. Strother brought David back for still more treatment on August 20, Dr. C. Benton told her that her son had contracted measles from the vaccine.

Mrs. Strother testified that David remained sick into September 1984. As he recovered David became listless. Hyperactivity and irritability followed the period of listlessness. Dr. C. Benton saw David again on January 2, 1985 and on four more occasions in January. He observed none of these symptoms of hyperactivity and irritability until David's next visit on July 11, 1985.

David also received treatment from Dr. John Axley, a neurologist. On March 4, 1986, Dr. Axley examined David. On March 26, 1986, David underwent a CT scan on his head and an electroencephalogram (EEG). Neither test revealed significant abnormality.

In March 1987, David suffered a generalized seizure. On February 10, 1988, David had a second EEG. This EEG disclosed abnormalities consistent "with a generalized encephalopathic process...." Transcript of Proceedings, No. 88–32V, filed August 23, 1989 (Tr.), Exhibit (Ex.), 3–A, at 18. In other neuropsychological evaluations performed at that time, David displayed communicative, social, and academic abilities well behind his chronological age. Tr., Ex. 3–A, at 15–17.

On October 17, 1988, petitioners filed a claim with the United States Claims Court for compensation under the Act. Respondent, after filing an answer contesting petitioners' entitlement under the Act, withdrew from the case on May 26, 1989. On August 10, 1989, the special master held a hearing to take evidence from seven witnesses for the petitioners. Respondent, consistent with its notice of withdrawal, did not appear at the hearing.

On September 18, 1989, the special master filed a Report and Recommended Decision (Report). The Report recommended an award to David of $1,331,041.00 for future medical and rehabilitative expenses, $334,328.00 for lost earnings, $150,000.00 for pain and suffering, and $12,890.95 for attorney fees and costs.

Respondent filed an Objection to Report and Recommendation for Judgment (Objection) on October 10, 1989. Respondent contended that petitioners had not shown that the vaccine in fact caused David's injury. Respondent also challenged the Report's recommended award for pain and suffering, lost earnings, attorney fees, and costs

---

1. This opinion and order may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen days after the date of this opinion and order, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen day period, then it shall be deemed that there is no material subject to § 300aa–12.

in excess of the $30,000.00 cap in 42 U.S.C. § 300aa–15(b). Finally, respondent faulted the Report for failure to reduce the compensation to account for any payments David might receive from state or federal health benefit programs.

Petitioners also objected to the recommended award in the Report. Petitioners argued for enhancement of the recommended award for future medical and rehabilitative expenses to account for around-the-clock home health care and to account for a normal life span for David. Petitioners further contended that the Report erred in finding that David's medical insurance already covers dental work. Petitioners also protested the Report's limitations on attorney fees and costs.

On November 3, 1989, this court held an oral argument. On November 17, 1989, this court remanded to the special master for a recommended judgment and a supplemental report. This court directed the special master to issue another Report and Recommended Judgment consistent with the court's opinion. *Strother v. Secretary, Dept. of Health & Human Servs.*, 18 Cl.Ct. 816, 818 (1989).

The special master held a Supplemental Hearing on December 15, 1989. The purpose of the hearing was to hear additional evidence regarding the cause in fact of David's encephalopathy. At the Supplemental Hearing, the special master took additional evidence from Dr. Lowell White, Dr. Cynthia G. McCormick and Mary Ellen Strother.

On January 8, 1990, the special master filed a supplemental report to this court (Supplemental Report). The special master recommended an award to David of $1,334,-755.00 for future medical and rehabilitative expenses, $12,766.36 for loss of earnings and pain and suffering and emotional distress, $14,357.68 for attorney fees, and $2,875.96 in costs. This recommendation complied with the $30,000.00 cap in Title 42.

On January 11 and 12, 1990, this court held two status conferences. Respondent informed the court of its objections to the special master's Supplemental Report. Respondent recommended that this court receive the expert medical opinion of another physician. Respondent agreed to be bound by the neutral determination of whether the MMR vaccine caused petitioners' injuries. Petitioners agreed that this neutral determination could become part of the record.

The parties agreed to seek from Dr. Paul Dyken, an expert in measles encephalopathy, his recommendation of an expert who could review David's condition. Dr. Dyken recommended three qualified candidates. Petitioners selected one of these doctors, Dr. John Benton, Professor of Pediatrics and Neurology at the University of Alabama at Birmingham, to review David's case. On March 14, 1990, this court appointed Dr. J. Benton as an expert witness in accordance with Rule 706 of the Federal Rules of Evidence. Dr. J. Benton received David Strother's medical records and instructions to prepare a report addressing whether the MMR vaccine caused David's condition.

On April 10, 1990, Dr. J. Benton supplied his report to the parties and the court. The report stated that Dr. J. Benton saw no evidence to suggest a causal relationship between the MMR vaccine and David Strother's encephalopathy.

On April 23, 1990, petitioners filed an objection to Dr. J. Benton's medical review and a request for a supplemental report pursuant to further instructions. The objection specifically contended that Dr. J. Benton based his report solely upon review of David's medical records without any direct consultation with petitioners' prior physicians. Petitioners also alleged that Dr. J. Benton based his opinions upon some inaccurate assumptions.

On May 1, 1990, respondent filed an objection to petitioners' motion. Respondent contended that the court's language with respect to consultation with other physicians or examination of David was permissive not mandatory. Thus, Dr. J. Benton had done only what he perceived as necessary to satisfy himself about David's condition.

On June 1, 1990, this court held a second oral argument. Petitioners objected to Dr. J. Benton's medical report alleging that it contained numerous inaccuracies and misconceptions regarding David's development. Petitioners also contended that Dr. McCormick's testimony was inconclusive as to an alternative etiology. Petitioners also argued that respondent's medical experts should be discredited because they simply reviewed David's previous records without examining David. Petitioners maintain that the testimony of Dr. White established causation in fact.

Based on the entire record, this court determines that the record does not show that the MMR vaccine in fact caused David Strother's injury.

### Discussion

Respondent objects to the Supplemental Report on essentially the same grounds as the original Report: insufficient proof of causation in fact, possibility of alternative etiology, and improper application of the $30,000.00 cap.

### Table Injury

The Act authorizes compensation "to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death ... is due to factors unrelated to the administration of the vaccine...."

42 U.S.C. § 300aa–13(a)(1). Petitioners bear the burden of proving the factors stated in § 300aa–11(c)(1). Section 300aa–11(c)(1) requires, in principal part, that petitioners show either that they "sustained ... [an] injury or condition set forth in the Vaccine Injury Table" or that they "sustained ... [an] injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine...." 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). Thus, petitioners must show by a preponderance of the evidence either that they sustained a Table injury or that the vaccine in fact caused their injury.

■ To show a Table injury, petitioners must prove two elements. First, petitioners must show that they sustained an injury—e.g., encephalitis, anaphylaxis, residual seizure disorder—listed on the Table in § 300aa–14. Second, petitioners must show that they suffered the first symptoms of this injury within the time limits listed on the Table. Thus, the Vaccine Injury Table sets forth a list of vaccines, potential injuries, and time frames for initial manifestation of the injury. If an individual received a listed vaccine and sustained a listed injury within a listed time period, the injury is presumed compensable.[2]

The Vaccine Table, in effect, determines by law that the temporal association of certain injuries with the vaccination will constitute sufficient proof that the vaccine caused the harm. The Table replaces traditional tort standards of causation in fact with a causation in law based on temporal association. The House Committee on Energy and Commerce explained the merits of this approach:

2. The Act also appears to presume that, in the absence of proof of another cause, the vaccine caused the encephalopathy. 42 U.S.C. § 300aa–14(b)(3)(B). This presumption appears to override the temporal relationship requirements of the Table. Thus, the Table in § 300aa–14 appears to conflict with the provisions of § 300aa–14(b)(3)(B). This court seeks additional clarification of this apparent ambiguity by examining the Act's legislative history. The House Report explains:

[T]he subsection also restates in specific terms the general rule described in Section 2113 and provides that if the cause of an

encephalopathy is an infection or another condition not related to the vaccine, the encephalopathy is not to be considered compensable. If, however, the court is unable to determine the cause of an encephalopathy, the encephalopathy is to be considered compensable if other conditions (including specified time of initial onset) are met.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 19 (1986), U.S.Code Cong. & Admin.News 1986, pp. 6287, 6360. Thus, this presumption in § 300aa–14 merely restates specifically the requirements of the Table, including time limits for the onset of the injury.

The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related. The Committee anticipates that the research on vaccine injury and vaccine safety now ongoing and mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, the Secretary or the Advisory Commission on Childhood Vaccines (discussed below in Section 2119) may propose to revise the Table, as provided below in Section 2114. Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 18 (1986), U.S.Code Cong. & Admin.News 1986, p. 6359. Thus, the Table provides for causation at law based on proximate temporal relationship between the vaccination and the onset of certain injuries.

In the case at bar, the special master Report stated:

> No symptoms of an encephalopathy or seizure disorder occurred within the first fifteen days following the administration of the vaccine.

Report, at 13. The evidence amply supports this proposed finding. Dr. C. Benton, David's treating physician, saw David numerous times in the two week period following the vaccination, yet he observed no symptoms of encephalopathy or seizures. Tr., at 32; Ex. 1, at 3. A CT scan and an EEG performed on March 26, 1986—more than 19 months after the vaccination—revealed no abnormalities. Notice of Additional and Supplemental Medical Records, No. 88–32V, filed Feb. 7, 1989 (Notice), at Section IX, pp. 4–5. Dr. John Axley—who performed the initial CT and EEG tests, performed neurological exams, and otherwise treated David—did not diagnose en-

cephalitis or seizure disorders. *Id.* at 1–5. These factors are only a sampling of the evidence showing that David did not display symptoms of a Table injury within the prescribed Table time limits.

### Causation in Fact

The Act, in addition to providing compensation for injuries meeting the Table's legal standards for causation, also compensates individuals who can show that a vaccine in fact caused their injury. The traditional causation in fact standard governs vaccine tort cases in state and federal courts outside the Act. *See, e.g., Alvarez v. United States,* 495 F.Supp. 1188, 1206 (D.Col.1980). These other state and federal vaccine tort cases are not subject to the compensation limits of the Act.

■ Temporal association alone establishes legal causation for a Table injury. Temporal association of the onset of injury with the vaccination is not sufficient, however, to establish causation in fact. *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983). The United States Court of Appeals for the Sixth Circuit clarified:

> [T]he inoculation is not the cause of every event that occurs within the ten day period.... Without more, this proximate temporal relationship will not support a finding of causation.

*Hasler,* 718 F.2d at 205. When a petitioner relies upon proof of causation in fact rather than proof of a Table injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury. *Hasler,* 718 F.2d at 205–06.

The statute distinguishes Table injuries from injuries caused in fact by the vaccine. Section 300aa–11(c)(1)(C)(i) discusses Table injuries. Section 300aa–11(c)(1)(C)(ii) discusses two forms of injury requiring proof of causation in fact. Subparagraph (I) discusses injuries "not set forth in the Vaccine Injury Table but which [were] caused by a vaccine...." Sub-paragraph (II) discusses injuries "set forth in the Vaccine Injury

Table the first symptom or manifestation ... of which did not occur within the time period set forth in the Table but which [were] caused by a vaccine...." The statute thus distinguishes between proof of a Table injury and proof of causation in fact.

 This distinction in statutory language underscores the differences in proof required for Table injuries as compared to injuries caused in fact by the vaccine. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hasler*, 718 F.2d at 205–06; 42 U.S.C. § 300aa–13(a)(1). Temporal association between petitioners' injury and the vaccination alone does not prove causation in fact. Moreover, similarity of petitioners' injury to injuries listed on the Table does not show causation in fact. Encephalitis, seizure disorders, and other Table injuries can have causes other than administration of a vaccine.

The Act's legislative history explains further the distinction between a Table injury and causation in fact. The House Committee on Energy and Commerce stated:

If the petitioner sustained or had significantly aggravated an injury not listed in the Table, he or she may petition for compensation. If the petitioner sustained or had significantly aggravated an injury listed in the Table but not within the time period set forth in the Table, he or she may petition for compensation. In both of these cases, however, the petition must affirmatively demonstrate that the injury or aggravation was caused by the vaccine. Simple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner. (Such a finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.)

H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 15 (1986), U.S.Code Cong. & Admin.News

1986, p. 6356. The Act relaxes proof of causation for injuries satisfying the Table in § 300aa–14, but does not relax proof of causation in fact.

 In the case at bar, the record does not contain sufficient evidence to show causation in fact. A CT scan and EEG performed 19 months after the vaccination showed no abnormalities. An EEG did not detect encephalopathy until more than 42 months after the vaccination. Tr., Ex. 3–A, at 18. Medical records did not document a generalized seizure until 31 months after the vaccination. Tr., Ex. 3–A, at 10.

The Report further noted the lack of contemporaneous medical evidence that the vaccine caused David's injuries. Report, at 12. There is dearth of medical records showing a logical connection between the vaccination and the encephalitis. Petitioners did not provide contemporaneous medical records documenting David's injury and relating David's condition directly to the vaccine. *See also* (Second Oral Argument, No. 88–32V, held June 1, 1990 (SOR) at 44). Rather, the Report states that "it is not clear from the record when [David's] symptoms first appeared." Report, at 12.

Dr. Lowell E. White, petitioners' causation witness, also noted repeatedly the absence of contemporaneous medical records. Dr. White stated:

The thing that was confusing to us as clinicians was why during the time that the child was obviously behaving peculiarly which were changes in consciousness that the child didn't get into a point of medical observation but I just have to accept the fact that that happened.

Tr., at 82. At other points, Dr. White noted that portions of his medical opinion were based on what David's mother told him, not on medical observations, tests, or examinations. *See, e.g.,* Tr., at 83, 89. Due to the gaps in medical records, Dr. White often employed uncertain terms to describe his medical opinions. *See, e.g.,* Tr., at 83–84 ("I just have to assume that something went on in terms of just the chronology of this.... it certainly sounded to all of us that were involved ... I think we all felt that way....").

In the Supplemental Hearing Dr. White was no less uncertain in describing his medical opinions. "I have difficulty with the word 'caused' because I was not there...." Transcript of Proceedings, filed Dec. 26, 1989 (Supp. Tr.), at 16. He similarly stated: "I'm having to hedge on this because I don't think anybody knows." Supp. Tr., at 16. Further, "I don't believe we know for sure." *Id.*

The Act requires the court to base a finding of compensability on "medical records" or "medical opinion." 42 U.S.C. § 300aa–13(a)(1). The dearth of medical records raises a considerable barrier to a finding of causation in fact. This barrier becomes even higher in the face of uncertain signals sent by testifying physicians, CT scan results, and the first EEG examination.

Several medical doctors testified at the August 10, 1989 hearing held in Pensacola, Florida. Dr. C. Benton, David's family doctor, did not testify about the cause of David's injuries, but indicated that he observed no symptoms of encephalopathy or seizure disorder in the 15 days following the vaccination. Tr., at 32. Dr. C. Benton further testified that David may have contracted measles before administration of the vaccine. Tr., at 15–16, 29. Dr. C. Benton also noted that David suffered from recurring acute infections. Tr., at 19–20, 25–26.

Dr. Axley, David's other treating physician, did not testify, but compiled records of his examinations. He described David nearly 19 months after the vaccination as "very hyperactive and demonstrates while constantly in motion throughout the office some mild decrease in fine and gross motor skills but rather good coordination and good energy levels." Notice, Section IX, p. 1. Neither of David's treating physicians, who on occasion saw David as often as four or five times within a month, presented medical records or medical opinion that the vaccine caused David's injuries.

Dr. White, presented by petitioners as their chief causation witness, similarly left many causation questions unanswered. As the Report documents, "Dr. White was unable to state with certainty that the MMR vaccine caused encephalitis in David, but he 'felt' that he had ruled out causes other than a viral infection." Report, at 10. Dr. White stated that he did not know whether the vaccine injured David. Tr., at 82. Moreover, Dr. White's "feeling" that he had ruled out causes other than a virus does not clearly associate the damaging infection with the vaccination. Rather, when asked point-blank if he could state with a reasonable degree of certainty the event which caused David's condition, Dr. White responded:

> He [David] has a condition now that is certainly explainable by encephalopathy of a stable nature and could well have been the result of a post-infectious response, allergic response within the brain that we call encephalitis.

Tr., at 82. Dr. White said David has a condition "explainable by encephalopathy" which "could well have been the result" of an infection. In response to this direct causation question, Dr. White did not say that David's infection caused encephalopathy. Nor did Dr. White state that the damaging infection resulted from the vaccination.

Petitioners' counsel immediately asked Dr. White if the MMR shot caused David's encephalitis. Dr. White responded:

> Well, I don't think when I saw him that I could say one way or the other. I think what I end up seeing as a clinician is that here are the facts and what we've got it down to was gathering a fair amount of data that made us zero in to that event.
>
> That event, when we started to get all of the data, followed the typical kind of a pattern that you see in post-infectious encephalitis, *whether due to vaccine or what I don't know.*

Tr., at 82 (emphasis added). In other words, Dr. White was searching for some answer to the riddle posed by David's condition. By a process of elimination, he felt that he had narrowed the cause down to post-infectious encephalitis. Dr. White

could not identify the cause of that infection as the vaccine. *Id.*[3]

Dr. White also testified that David was very susceptible to infections. In fact, when Dr. White tested for measles antibodies, David reacted both to the measles and the vehicle. Tr., at 94. This reaction prevented Dr. White from interpreting the test results, but established David's sensitivity to infection. Tr., at 95. Indeed Dr. White testified that David "tends to have an awful lot of fever problems, allergic problems, *et cetera.*" *Id.* Moreover Dr. White stated that David's susceptibility to fevers and allergies "may be significant" to David's injury. Tr., at 95.

Medical records, including EEG tests, did not document David's encephalopathy until long after the vaccination. David's medical records and medical testimony from Drs. C. Benton and White corroborate David's sensitivity to infection. Therefore, Dr. White's failure to state which infection, if any, caused David's injury takes on significance. Linking David's injury to infection does not identify which infection or infections may have caused David's tragic condition. These factors place added weight on Dr. White's statement that he did not know if the vaccine was the infection that caused David's injury. Unlike other petitioners alleging causation in fact, *see, e.g., Donald Shaw, et al. v. United States*, 18 Cl.Ct. 646 (1989), no doctor or medical professional conclusively testified that the vaccine caused the injury.

At the Supplemental Hearing held on December 15, 1989, Dr. White testified further on the cause of David's condition. Dr. White was again uncertain in his medical opinions. At one point he testified that while he had difficulty with the word "cause" it was his medical opinion that the vaccination caused David's condition. Supp. Tr., at 16, 19. Yet, Dr. White later

testified to the special master that he had "difficulty in the questions.... because I think that to say it was not the insult that caused the problem is just a[s] difficult as saying it was. And I don't know how to prove either one in my own mind." Supp. Tr., at 47. Dr. White similarly responded when Dr. McCormick asked him if he felt comfortable saying for sure that David had measles encephalitis. Dr. White responded: "No. Any more than you can say that he can't have it. I don't know." Supp. Tr., at 143.

Dr. White based his tenuous remarks on causation on David's "definite change in general demeanor which he believed was highly indicative of the fact that the child had had some type of central nervous system insult." *Id.* at 21. However, Dr. White also stated that "[a]ll we can do, and all I can do as a clinician on cause and effect basis is to suggest that something happened to this child around 18 months of age that arrested his development." Supp. Tr., at 133.

Thus, Dr. White was unsure about whether the vaccine caused David's condition. Dr. White's testimony simply suggested that something happened to David, and made explanations consistent with that fact. Dr. White, however, did not develop a medical theory causally connecting the vaccination to the injury; he merely suggested a possible correlation. Dr. White's testimony rises only to the level of conjecture. The United States Court of Appeals for the Sixth Circuit noted: "A conjecture is simply an explanation that is consistent with knowing the fact or conditions, but not deductible from them as a reasonable inference." *Hasler v. United States*, 718 F.2d 202, 205–06 (6th Cir.1983), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). Dr. White's statements explain

---

**3.** The Special Master asked Dr. Robert K. Wilson several questions about causation during the hearing. Dr. Wilson had written a letter on December 7, 1988, linking David's injury to the approximate time frame of the vaccination. Notice of Additional and Supplemental Medical Records, No. 88–32V, filed Feb. 7, 1989, Section X. Under questioning about the cause of the injury, however, Dr. Wilson stated:

It was almost impossible for me to form an opinion....

Tr., at 133. Dr. Wilson had gleaned his observations about causation of the injury from Dr. White's examination and conclusions. Tr., at 134–35. Dr. Wilson felt incapable of forming an independent opinion of causation. Tr., at 135, 138. The Report did not rely on Dr. Wilson's testimony for any causation findings.

the facts but do not purport to prove that David's condition flows logically and sequentially from the vaccination. Dr. White only proves temporal association, which is insufficient to establish causation in fact.

Further, Dr. White offered inconsistent testimony about causation. Dr. White testified that most children with encephalitis die. Supp. Tr., at 39. Yet, David did not even see a doctor during the period that he allegedly suffered from encephalitis. Dr. White noted his surprise about petitioners' failure to seek medical attention for such a serious malady. Supp. Tr., at 38.

Dr. Cynthia McCormick's testimony at the Supplemental Hearing corroborates this court's conclusion that there is a dearth of medical records from which to conclude, with certainty that the MMR vaccine caused David's condition. Dr. McCormick stated conclusively:

> My opinion is that we don't have enough evidence to make that kind of statement, that there's nothing in the record to suggest that the child had measles encephalitis, there were no studies done to suggest whether or not the child might have had measles encephalitis. No one was thinking about measles encephalitis.

Supp. Tr., at 104–05.

Dr. John W. Benton, the court-appointed expert and a noted specialist in measles encephalitis, made a similar finding. He completely reviewed David Strother's medical records and filed his opinions in a Report to this court. Opinion, filed May 1, 1990 (Opinion). Based on medical records, Dr. J. Benton could not find substantial evidence that encephalitis occurred in reaction to the vaccine. Opinion, at 3.

Dr. J. Benton's Opinion explained that viral encephalitis from measles has two forms. The first form causes very severe reactions, including acute onset of stupor, coma and seizures as well as a high mortality and morbidity rate. Dr. J. Benton maintained that if patients survived this first form, they typically would gradually improve after remaining catastrophically ill in the hospital for a number of days. Dr. J. Benton did not conclude that David suffered this kind of violent reaction. Dr. J.

Benton concluded that such an illness "[c]ertainly ... would have been brought to medical attention." *Id.* Moreover, appearance of a rash and illness ten to twelve days following the MMR vaccination "does not necessarily infer a specific disease of either viral, bacterial or allergic origin." *Id.*

The second form of measles-associated viral encephalitis is a subacute sclerosing encephalitis which has a more insidious onset and can be delayed by months or even years following measles. However, this form typically occurs following wild measles and not the measles vaccination. Dr. J. Benton explained that the second form of encephalitis would be a progressive disorder. David's records did not show the progressive deterioration necessary for this diagnosis. *Id.* Thus, Dr. J. Benton, based on a review of David's medical records, agreed with Dr. McCormick:

> I can find no evidence in the materials furnished by the Court to suggest a causal relationship between the administration of MMR (measles, mumps, rubella) vaccination and the patient's encephalopathy.

Opinion, at 4.

In sum, neither the Report nor the Supplemental Report, nor the testimony of plaintiff's medical witnesses set forth any medical theory to support a finding of causation in fact. Dr. White testified about David's susceptibility to infection, but could not relate that susceptibility to the vaccine. Rather Dr. White made only the most general conclusion about causation. He did not identify which infection, if any, may have caused David's injury. Petitioners do not present any medical theory explaining the logical sequence of cause and effect leading from the vaccination to the injury which appeared many months later. Finally, both Dr. McCormick and Dr. J. Benton concluded from viewing the available medical records that David's encephalopathy was not caused by the MMR vaccine. Thus, petitioners have failed to show by a preponderance of the evidence the first essential element for compensation—legal causation or causation in fact.

## Alternative Etiology

■ The Act also requires this court to determine the absence of causes other than the vaccination before awarding compensation. 42 U.S.C. § 300aa–13(a)(1). A successful showing of legal causation or causation in fact does not entitle petitioners to compensation. This court still must find that "there is not a preponderance of evidence that the ... injury ... is due to factors unrelated to the administration of the vaccine...." 42 U.S.C. § 300aa–13(a)(1)(B). Under this language, if there is no evidence of alternative causes or if the evidence is evenly balanced, the requirement of § 300aa–13(a)(1)(B) would be satisfied. If, however, there is a preponderance of evidence showing an alternative cause, petitioner may not receive compensation.

Section 300aa–13 specifically requires petitioners to carry the burden of proving a Table injury or causation in fact. Section 300aa–13, however, requires the court must weigh the record as a whole with regard to etiologies unrelated to the vaccine. Both the petitioners and the respondent provide evidence concerning causes of the injuries. 42 U.S.C. § 300aa–11(c); 42 U.S.C. § 300aa–12(b). This court makes a finding about causes other than administration of the vaccine. 42 U.S.C. § 300aa–13(a)(1)(B).

Dr. White purported, with considerable equivocation, to have eliminated all causes of David's encephalopathy other than the MMR vaccine. If the record, by a preponderance, eliminated all other causes, then this court would share Dr. White's somewhat tenuous opinion that the vaccine in fact caused the injury. The record, however, contains considerable evidence of alternative etiologies.

Section 300aa–14 lists several alternative etiologies for encephalitis, including "infection, toxins, trauma, or metabolic disturbances." 42 U.S.C. § 300aa–14(b)(3)(B). Dr. White himself suggested one alterna-

tive etiology. Dr. White testified that he had ruled out trauma, Tr., at 86, and heredity, Tr., at 79, as alternative causes of David's condition. When asked if he had ruled out causes other than a viral infection, Dr. White responded:

Well, to all of us that were involved we felt we had. I think you can continue to do laboratory studies but that's sort of a debate rather than the real problem, which is a clinical one. I think we all felt that way and I could really say no more than that.

Tr., at 84. Dr. White suggested that a viral infection other than measles from the vaccine may have caused David's injury.

Infection is one of the alternative causes of encephalopathy. David's medical record shows that he contracted numerous infections before the vaccination, immediately after the vaccination, and after the vaccination but before medical records indicate appearance of the injury.

The record suggests that an infection other than measles from the vaccine may have caused David's injuries.[4] The record, however, does not provide this court with sufficient evidence to determine that the vaccine caused the damaging viral infection. Dr. J. Benton stated: "I do not find substantial evidence for the occurrence of an encephalitis or encephalopathy as a reaction to the vaccine that would be compatible with the severe retardation that the patient subsequently has experienced." Opinion, at 3.

Dr. White directly testified that he did not know that the vaccine caused the injury. He stated: "I think you can get this kind of a response from many proteins." Supp. Tr., at 25. Thus, David's injury could have been the result of a viral infection unrelated to the vaccine. At the Supplemental Hearing, Dr. White testified on whether he dismissed the likelihood or the possibility that David's condition might

---

**4.** Dr. C. Benton, the treating physician, and Dr. White, the reviewing physician, reached some different conclusions about some of these infections. Dr. C. Benton testified that David may have been suffering from preexisting infections at the time of vaccination. Tr., at 25–29. Dr.

White testified that these preexisting infections might have been bacterial, rather than viral. Tr., at 90–91. Dr. White said the symptoms described by Dr. Benton are "usually not" viral infections. Tr., at 91.

have resulted from some viral infection other than the vaccine. He answered:

> I didn't eliminate it, but it just didn't seem likely in terms of the facts.... [b]ecause in this particular situation, this problem tended to follow the measles vaccine.... I'm having to hedge on this because I don't think anybody knows. I think it's the same situation if we were dealing with ... poliomyelitis, where most of the real polio that we see today probably comes from the vaccine.... But we don't know this for a fact. But the data tends to suggest this.

Supp. Tr., at 25.

Before the Supplemental hearing, Dr. Cynthia McCormick reviewed the medical records of David Strother and prepared a report. Her report stated that the medical records "fail to document or even suggest the new onset of an encephalopathy following the administration of the vaccine." Supp. Tr., Ex. 14 at 3. Dr. McCormick concluded that medical records failed to show that coma occurred after the vaccination or that there was a temporal relationship between the vaccination and the onset of either hyperactivity or seizures. *Id.* Dr. McCormick stated:

> David has evidence of an underlying condition unrelated to the administration of the vaccine. He experienced developmental delays preceding the immunization, dysmorphic features, and macrocephaly which has developed gradually over the first several years of life and at last measurement appeared to be increasing.

*Id.*

At the Supplemental Hearing, Dr. McCormick testified that a reliable conclusion was not possible without researching alternative etiologies. Supp. Tr., at 90. Dr. McCormick also noted that a direct viral invasion was more likely than encephalitis because of the timing of the symptoms closely following David's rash. Supp. Tr., at 92.

Dr. McCormick concluded that David did not suffer from encephalopathy in view of inconsistencies in the record. Supp. Tr., at 94–95. The record provided support for Dr. McCormick's reasoning. While David's mother testified that she had a low threshold for discomfort, she did not bring David to the doctor when he purportedly was comatose. The first contact with the doctor concerned David's peeling feet. Supp. Tr., at 95–96. If the child was comatose, how could he have avoided dehydration without intravenous administration of fluids at the hospital. *Id.* at 96. Further, there is conflicting testimony about David's development before administration of the vaccine. David was not normal when he received his vaccination—he had exhibited delay in walking. *Id.* at 97. Similarly, there is evidence that the child's condition was not static, but was deteriorating for several years. *Id.* at 102.

Dr. McCormick also concluded that David may have suffered from a condition other than encephalopathy. Dr. McCormick prepared a graph depicting growth rate of David's head size. *See* Tr., at Ex. 15. She testified that David's head grew at a "pathological" rate, and "[t]he most likely etiology would be one of the neuronal storage diseases." Supp. Tr., at 106. The other reviewing and attending physicians did not consider such a possibility. *Id.* at 106–07. While Dr. McCormick did not conclude absolutely that David had a neuronal storage disease, she correctly acknowledged: "[W]e owe it to this child to look, because based on what we have in the clinical records, this is a real consideration." *Id.* at 107.

Parts of the medical records support Dr. McCormick's theory. Dr. White indicated that David's extreme head growth caused him suspicion in the beginning, "that there was something else going on rather than this measles thing." Supp. Tr., at 140. Dr. White later dismissed the possibility simply because "there just isn't anything there." *Id.* at 140–41.

The Act distinguishes between proof of causation and alternative etiologies. Section 300aa–13 clearly requires evidence of both causation in fact and lack of an alternative etiology before the court may award compensation. Nonetheless, conclusive medical evidence eliminating all possible

causes other than the vaccine could contribute to a finding of causation in fact.

In this case, the record concerning alternative etiologies underscores petitioners' failure to prove causation in fact. Dr. White suggests that an infection unrelated to the vaccine could have caused the injury. Dr. McCormick posits that a neuronal storage disease caused the injury. Dr. J. Benton concludes that the vaccine was not the cause. This court's examination of alternative causes reinforces petitioners' failure to show causation in fact.

### $30,000.00 Cap

■ The Report recommended award of $150,000.00 for pain and suffering, $334,328.00 for lost wages, and $12,890.95 for attorney fees and costs. Report, at 31. Respondent contends that this recommended award would exceed the $30,000.00 statutory cap of 42 U.S.C. § 300aa–15(b). Respondent would apply the cap to the aggregate of pain and suffering, lost wages, and attorney fees and costs. The Report recommends application of the cap to only that portion of attorney fees and costs expended to prove damages for pain and suffering and lost wages. Report, at 25–31.

The language, legislative history, and logic of § 300aa–15(b) support respondent's reading of this provision. In retroactive cases—cases where the vaccination occurred before enactment of the Act —§ 300aa–15(b) lists what compensation the court may award. Specifically, the first clause of § 300aa–15(b) states that the court "may not" award pre-judgment medical or rehabilitative expenses. 42 U.S.C. § 300aa–15(b). Under the next clause of § 300aa–15(b), the court may award attorney fees and costs provided in § 300aa–15(e). *Id.* Finally, according to § 300aa–15(b)'s final clause, the court may award compensation for lost wages under § 300aa–15(a)(3) and for pain and suffering under § 300aa–15(a)(4), "except that the total amount that may be paid [for these two items] ... and included as attorneys' fees and other costs" may not exceed $30,000.00. The Act does not expressly state, but clearly intends, that this court may award compensation for post-judgment medical and rehabilitative expenses in retroactive cases.[5]

By setting off the exception clause with a comma, the Act shows an intention to apply the $30,000.00 cap only to those elements listed after the grammatical separation—lost wages, pain and suffering, and attorney fees and costs. The words "the total amount" also suggest the totalling of different compensation elements—lost wages, pain and suffering, and attorney fees and costs—before application of the limitation. Indeed, as pointed out earlier by the Claims Court, the "and included as" language also links references to the different elements of § 300aa–15(a)(3), (a)(4), and (e). *Mikulich v. Secretary of Health & Human Servs.*, 18 Cl.Ct. 253 (1989). The court must add these different elements together before applying the cap. The statutory language supports respondent's reading.

To the extent that ambiguity remains after an analysis of the statutory language, the legislative history of § 300aa–15(b) also states that the cap applies to the aggregate of awards under § 300aa–15(a)(3), (a)(4), and (e). Congress added the contested language to the Act in the Omnibus Budget Reconciliation Act of 1987. The House Report accompanying that 1987 amendment

---

5. The legislative history expressly states this intent. For instance, the House Report on the Omnibus Budget Reconciliation Act of 1987 included a letter from the Congressional Budget Office:

Under current law, limited compensation would be available to those who suffered certain vaccine-related injuries prior to the effective date of the program. For these retroactive cases, compensation would be made to cover death settlements and attorneys' fees and periodic payments would be made to cover future medical and rehabilitation expenses. H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 693 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–361, 2313–367. Furthermore, the section-by-section analysis in that Report stated:

The Act allows retroactive cases to recover only for ongoing medical expenses and for attorney fees and costs.

*Id.* at 2313–371.

included a letter from the Congressional Budget Office:

> Although the types of compensation payable [in retroactive cases] would be expanded under the bill, a limit of $30,000 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess., 693 *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–361, 2313–367.

The section-by-section analysis of § 300aa–15(b) further clarified:

> The amendments also authorize payment for lost earnings and pain and suffering [in retroactive cases], but limit the amount of payment that can be made for all compensation except future medical expenses to a total of as much as $30,000, depending upon demonstrated need and particular circumstances.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess., 697–98, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–361, 2313–371, 2313–372. These statements in the House Report clarify that the $30,000.00 cap applies to the total of three elements of compensation.

Petitioners argue in favor of the special master's interpretation of Section 300aa–15(b), which applies the cap to attorney fees only. Petitioners, however, offer no reasonable explanation for why Congress would apply the cap to only that portion of attorney fees generated in proving pain and suffering and lost wages. Petitioners are most likely to incur attorney fees in proving entitlement to compensation, yet the Report would exempt those attorney fees from the cap. Thus, a limit on attorney fees would not logically encompass only those attorney fees incurred to prove two narrow kinds of compensation.

The special master's and petitioners' reading of § 300aa–15(b) would compensate some attorney time and subject other attorney time to a cap. Thus, a determination of attorney fees would require apportionment between capped and fully compensable attorney fees. The Claims Court has commented on the difficulty of such apportionments:

> It would be nearly impossible to segregate the efforts expended on the liability issue from those devoted to damages questions in this case.

*Kunz Const. Co., Inc. v. United States,* 16 Cl.Ct. 431, 435 (1989). In vaccine cases, proof of liability is also intertwined with proof of damages. For this reason as well, the Report's reading of § 300aa–15(b) defies application.

This court determines that § 300aa–15(b) requires application of the $30,000.00 cap to the total compensation awarded for pain and suffering, lost wages, and attorney fees and costs.

■ Though petitioners are not entitled to compensation, the Act authorizes this court to award reasonable attorney fees and costs. Section 300aa–15 states:

> If a judgment of a court ... does not award compensation, the court may include in the judgment an amount to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if ... brought in good faith and there was a reasonable basis for the claim....

42 U.S.C.A. § 300aa–15.

Here, petitioners prosecuted their claim in good faith and with reasonable grounds. Thus, petitioners may recover $2,875.96 in costs—an amount which the special master believed reasonable under the circumstances. Petitioners also may recover reasonable attorney fees not to exceed $27,124.04. Without further order, plaintiff may submit to the Clerk of the court, and the Clerk shall allow, a request for attorney fees not to exceed $27,124.04.

## ORDER

After reviewing the entire record, this court concludes that petitioners did not show that the MMR vaccine was the cause in fact of David's encephalopathy.