Arun K. AGARWAL, as curator of the estate of Anju Agarwal, Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1760V.

United States Court of Federal Claims.

May 9, 1995.

Publication Ordered May 16, 1995.

James B. Caldwell, Shreveport, LA, for petitioner.

Tarek Sawi, Dept. of Justice, Washington, DC, for respondent.

## DECISION

HASTINGS, Special Master.

This is an action seeking an award under the National Vaccine Injury Compensation Program (see 42 U.S.C. § 300aa–10 et seq.[1]). For the reasons stated below, the undersigned special master concludes that the petitioner is not entitled to such an award.

## I

### BACKGROUND FACTS

Anju Agarwal was born on November 25, 1967. Her father, Arun K. Agarwal, is the petitioner in this case, acting as her legal representative. Anju was born in India, but soon moved to the United States with her parents. Unfortunately, the available medical records shed little light on her development as an infant, since the records of her pediatric care prior to 1973 have been destroyed. Her parents have testified in this hearing that she appeared to be a normally developing infant.

On May 28, 1970, July 9, 1970, August 13, 1970, and August 12, 1971, Anju received "DPT" (diphtheria, pertussis, tetanus) immunizations in Lincoln Parish, Louisiana. (Ex. 2.[2]) Unfortunately, the parties have been unable to obtain any medical records made at any time soon after any of the first three inoculations. However, a hospital record made on August 25, 1971, thirteen days after the fourth immunization, states specifically that Anju had convulsions after DPT inocula-

tions on August 13, 1970, and August 12, 1971. (Ex. 3, pp. 2–3.) Another notation in the same hospital's records, also made on August 25, 1971, states further that she had convulsions "following each DPT injection." (Id. at p. 1.) In addition, certain notations were made on the record of Anju's immunizations, kept at the Lincoln Parish Health Unit where she received her inoculations, apparently by personnel at that Health Unit. One note seems to indicate that after the third immunization Anju was "sick [with] fever 104°—had convulsions." (Ex. 2.) Another, written immediately below the notation of the fourth immunization, states "child had another convulsion." (Id.) Anju's parents also testified at the evidentiary hearing that Anju had convulsions after each DPT inoculation, each time accompanied by high fever.

Anju has not apparently suffered any seizures other than those which occurred soon after her inoculations. Nor did she suffer any abrupt developmental regression or other signs of neurologic damage following at any time soon after any of those incidents. However, as the years went by it became more and more clear that Anju suffers from mental retardation. The first noted delays were in her speech development, and it has become clear that her overall cognitive function is significantly deficient compared to the norm. At the age of 26, she still lives with her parents, who believe that she will never be able to live independently.

No cause for these problems has ever been identified.

## II

### THE APPLICABLE STATUTORY SCHEME

A. *Requirements for an award*

■ Under the National Vaccine Injury Compensation Program (hereinafter sometimes the "Vaccine Program" or "the Pro-

---

1. The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa–10 et seq. (Supp. IV 1992). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. as contained at Supp. IV 1992.

2. Petitioner filed Exhibits 1 through 12 with the petition, Exs. 13–17 on July 22, 1991, and further consecutively-numbered exhibits at various times thereafter. "Ex. __" references will be to these Exhibits.

gram"), compensation awards are made to individuals who have suffered injuries or deaths thought to be caused by certain childhood vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showings that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious long-lasting injury; and has received no previous award or settlement on account of the injury. Finally—and the key question in most cases under the Program—the petitioner must also establish a link, either temporal or causal, between the vaccination and the injury. The petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in § 300aa–14(a)—the "Vaccine Injury Table"—corresponding to the vaccination in question, within an applicable time period from the vaccination also specified in the Table. If so, the "Table Injury" is in effect *presumed* to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa–13(a)(1)(A); § 300aa–11(c)(1)(C)(i); § 300aa–14(a); § 300aa–13(a)(1)(B).

As relevant here, one vaccine listed in the Vaccine Injury Table is the "DPT" inoculation (*i.e.,* diphtheria, pertussis, and tetanus, also known as "DTP"), and two of the "Table Injuries" listed for that vaccine are "residual seizure disorder" and "encephalopathy" (*i.e.,* brain injury). The Table further provides that to qualify the vaccine recipient for an award, either such injury must have been first manifested within *three days* of the inoculation. § 300aa–14(a)(I)(B) and (D).

Alternatively, if no injury falling within the Table can be shown, the petitioner may gain an award by instead showing that the recipient's injury was *caused by* the vaccination in question. § 300aa–13(a)(1)(A); § 300aa–11(c)(1)(C)(ii).

**3.** Petitioner would also appear to satisfy the "$1000 requirement" of § 300aa–11(c)(1)(D)(i)—

**B.** *Issues in this case*

In this case, it is undisputed that certain of the requirements of the Program have been met, since Anju received four Table-listed vaccinations (DPT) in the United States, currently suffers from significantly diminished mental capacity, and has not received any award or settlement on account of such condition.[3] Further, it is undisputed that within a day of each of at least two of her inoculations, and possibly after all four, Anju suffered convulsions. The ultimate issue for me to decide here is whether, based upon those facts, petitioner is entitled to a Program award on Anju's behalf.

As to the petitioner's theory of proof in this case, I should note that the record is somewhat muddled. In the very first paragraph of the original petition in this case, petitioner alleged the Table Injuries of "encephalopathy" and "residual seizure disorder." In later documents filed prior to the evidentiary hearing held in this case, however, and even at the outset of the hearing itself, petitioner's counsel purported not to allege any Table Injuries, but rather to intend to prove that Anju's mental retardation was "caused-in-fact" by her DPT inoculations. Nevertheless, because Anju clearly did suffer seizures soon after two or more inoculations, at the hearing I questioned Anju's parents concerning the circumstances surrounding Anju's convulsions, and also specified for both parties' benefit that I was closely considering whether the facts of the case fit within the "Table Injury encephalopathy" category. I gave both parties an opportunity to explore those "Table Injury" issues with the experts at the hearing, as well as the opportunity to brief the case posthearing. (Respondent's briefs were filed on July 13 and August 2, 1994; petitioner's on August 16, 1994.) Accordingly, in the interest of justice, I find it appropriate that I explore the two potential Table Injuries originally alleged, as well as the "causation" question ultimately advanced raised by petitioner at the hearing. I will address each of these three issues separately below.

see the hearing testimony of her father.

## III

### ISSUE OF "TABLE INJURY SEIZURE DISORDER"

■ I find it clear that Anju's case does *not* meet the statutory requirements for a "Table Injury seizure disorder." While Anju clearly did suffer a seizure[4] soon after at least two of her DPT inoculations, and possibly after each of her four shots, the statute also requires that within a year after a vaccination she also must have undergone "2 or more seizures * * * which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit." In the record before me, there exists no substantial evidence that Anju has ever at any time suffered *any* seizure falling within the statutory phrase quoted above, a category to which I will refer as "febrile" seizures. To the contrary, though the evidence is limited, it all points to a conclusion that each of Anju's seizures was accompanied by a high fever, likely greater than 102°.

For example, the only medical record which *actually records a specific temperature* during a seizure is the vaccination record, which records a temperature that appears to be 104°. (Ex. 2.) The other significant record on this issue is the history recorded by a neurologist, Dr. Bachman, on June 21, 1982, after he extensively questioned Anju's parents. Dr. Bachman recorded that each seizure incident was accompanied by "high fever." (Ex. 13, p. 8.) And while Dr. Bachman did not record what he meant by "high fever," respondent's expert neurologist Dr. Wiznitzer at the hearing indicated (without contradiction by petitioner's expert) that a neurologist would typically use that term to indicate fever of 104° or more. Finally, even Anju's parents have never asserted that she had any seizures unaccompanied by fever or accompanied only by slight or moderate fever. At the hearing, they testified that they could not remember specific temperatures, but that each seizure was accompanied by "high" fever.

Accordingly, it is clear that Anju did not suffer a "Table Injury seizure disorder."

## IV

### ISSUE OF "TABLE INJURY ENCEPHALOPATHY"

#### A. *Statutory definition*

As explained above, the basic statutory scheme provides that if Anju sustained an "encephalopathy," and the "first symptom or manifestation of the onset" of that encephalopathy occurred within three days of a DPT inoculation, then her encephalopathy will be presumed to have been caused by that inoculation. § 300aa–13(a)(1)(A); § 300aa–11(c)(1)(C)(i); § 300aa–14(a)(I)(B). Further, § 300aa–14(b), the "Qualifications and aids to interpretation" of the Vaccine Injury Table, provides the following definitional information for the term "encephalopathy" (§ 300aa–14(b)(3)(A)).

(3)(A) The term "encephalopathy" means any significant acquired abnormality of, or injury to, or impairment of function of the brain. Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

#### B. *The relevant facts*

As explained above, it is clear, and I find as fact, that Anju suffered seizures accompanied by high fever after at least two of her DPT inoculations. These seizures lasted no longer than 15 minutes. (See Ex. 13, p. 8.) There have been no other seizures since.

---

4. The medical records use the word "convul-

sion," which is a type of seizure.

In addition, Anju is currently mentally retarded. As to what constituted the earliest signs of her retardation, the record is less than clear. Anju's parents testified before me simply that Anju developed normally until after she received her series of DPT inoculations. But they did not elaborate on when they first noted any developmental problems in Anju. And while I certainly did not conclude that Anju's parents were being anything but honest in their testimony before me, I received the general impression that they did not have very clear memories of the events of so long ago.

On this issue, I find that the best evidence, limited though it is, is contained in the medical records. Anju's parents apparently reported to an educational diagnostician on January 5, 1983, that Anju "reached normal developmental [sic] at appropriate ages." (Ex. 8, p. 1.) Also, during the course of a speech evaluation done on June 29, 1982, Anju's parents apparently reported that she said her first real word sometime between the ages of 12 and 16 months, which would be within the normal range. (Ex. 7, p. 2.) Anju's parents also told the speech evaluation, however, that Anju "did not begin to connect words until three to four years of age which consisted of two words." (Id.) Further, a neurologist, Dr. Bachman, recorded a detailed history on June 21, 1982, again apparently based upon the report of Anju's parents. He recorded (Ex. 13, pp. 8–9) that—

> Developmental milestones are also not clear. Speech and language milestones were markedly delayed all along with no regression at any time. * * * No regression in language or development was associated with the DPT shots or the convulsions, as best [her family] can remember. * * * I doubt that [her speech problems are] from the DPT shots since as best I can understand the history, the speech delay antedated both the DPT and the convulsions, and there was no regression in language at that time.

At the hearing, respondent's expert Dr. Wiznitzer, a highly qualified pediatric neurologist, testified concerning this issue, concluding that the earliest known symptom of Anju's mental retardation consisted of delay in her speech, manifested *prior* to her first DPT shot. He relied in part upon the history quoted above of Dr. Bachman, who noted that "speech delay antedated * * * the DPT." (Ex. 8, p. 9.) He also relied in part upon the above-quoted history related to the speech evaluator, that Anju did not connect words until she was three to four years of age. Dr. Wiznitzer explained that if Anju did not connect any words by the time of her first DPT inoculation, when she was 2½ years of age, that would be, in retrospect, an indication of poor mental development. After Dr. Wiznitzer gave this testimony, petitioner's expert, Dr. Armistead, did not attempt to refute Dr. Wiznitzer's reasoning or conclusion in this regard.

Accordingly, on this issue, as a factual matter, I conclude that Anju likely did experience delay in her speech development predating her first DPT inoculation, which delay likely was a result of her mental retardation.

## C. Discussion

Based upon these facts as I have found them, has Anju suffered a "Table Injury encephalopathy," within the statutory meaning? I conclude that she has not.

To be sure, Anju did suffer febrile seizures after each of her latter two DPT inoculations, and possibly after each of her first two shots as well. And it is possible (although respondent hotly contests such a view) to view Anju's entire history of mental retardation as constituting an "encephalopathy," with these febrile seizures as early manifestations or symptoms of that encephalopathy. But even assuming that these febrile seizures can be considered manifestations or symptoms of encephalopathy, Anju would still not qualify for a Program award. That is because, pursuant to the statutory scheme, any encephalopathy that Anju has manifested is only compensable if the *first* symptom of that encephalopathy was manifested within a three-day period after one of her inoculations. See *Shalala v. Whitecotton,* —— U.S. ——, 115 S.Ct. 1477, 131 L.Ed.2d 374 (1995). And that is not the case here.

▮ Rather, even if one views Anju's mental retardation as an "encephalopathy," and also views her post-inoculation febrile seizures as symptoms of that encephalopathy, one would nevertheless have to also conclude that the *first* "manifestation" of that encephalopathy was the delay in her speech development described above. As noted above, I have found as fact, based upon the medical histories and the persuasive testimony of Dr. Wiznitzer at the hearing in this case, that Anju's speech delay likely did precede all of her DPT inoculations, and that this delay was in retrospect the first manifestation of her mental retardation. Accordingly, Anju clearly has not manifested an "encephalopathy" falling within the Vaccine Injury Table.[5]

## V

### ISSUE OF CAUSATION IN FACT

▮ It should be noted, initially, that in analyzing a contention of "causation-in-fact," the presumptions available under the Vaccine Injury Table are, of course, inoperative. It is clear that the burden is on the petitioner to show that in fact the vaccination in question more likely than not caused the condition *under the same standards which apply in traditional tort litigation*, where the same "preponderance of the evidence" standard applies. *Hines v. Secretary of HHS*, 940 F.2d 1518, 1525 (Fed.Cir.1991); *Carter v. Secretary of HHS*, 21 Cl.Ct. 651, 654 (1990), affirming No. 89–80V, slip op. at 7–8, 1990 WL 293453 (Cl.Ct.Spec.Mstr. June 27, 1990); *Strother v. Secretary of HHS*, 21 Cl.Ct. 365, 369–70 (1990), aff'd, 950 F.2d 731 (Fed.Cir. 1991); *Shaw v. Secretary of HHS*, 18 Cl.Ct. 646, 650–1 (1989). Thus, the petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect." *Strother, supra,* 21 Cl.Ct. at 370; accord, *Hines, supra,* 940 F.2d at 1525; *Carter, supra,* 21 Cl.Ct. at 654; *Hasler v. United States,* 718 F.2d 202, 205–6 (6th Cir.1983); *Novak v. United States,* 865 F.2d 718, 724 (6th Cir.1989). Temporal association alone is *not* sufficient. *Strother, supra,* 21 Cl.Ct. at 370; *Shaw, supra,* 18 Cl.Ct. at 650–651; *Carter, supra,* 21 Cl.Ct. at 654. Moreover, "similarity of petitioner's injury to injuries listed on the Table does not show causation in fact. Encephalitis, seizure disorders, and other Table injuries can have causes other than administration of a vaccine." *Strother, supra,* 21 Cl.Ct. at 370.[6]

In this case, it is clear that petitioner was not able to carry his burden as to "causation-in-fact."

As to this issue, I found that petitioner did not come close to making a case. Dr. Armistead simply did not impress me as very knowledgeable in this area, and he really made little effort to explain *why* he held his opinion. He cited no medical literature to support his conclusion. Dr. Armistead also seems to have been assuming that Anju's seizures were without fever, an assumption which is clearly contrary to the actual facts as I have found them. Indeed, I found Dr. Armistead's whole approach to the issue of whether the issues were febrile, in both his reports and in his hearing testimony, to be so illogical that it causes me to give very little weight to his opinion in general.

In contrast, Dr. Wiznitzer for the respondent gave a coherent presentation on this issue. He believes that in certain cases it

---

**5.** As to the issue of "Table Injury encephalopathy," I note that much of the extended discussion of this issue at the evidentiary hearing in this case, as well as the post-hearing briefing, was premised on the fact that at that time the controlling precedent, on the issue of whether the *first* manifestation of a "Table Injury encephalopathy" must occur within the 3–day period post-vaccine, was *Whitecotton v. Secretary of HHS*, 17 F.3d 374 (Fed.Cir.1994). That precedent was reversed by the Supreme Court, however, in *Shalala v. Whitecotton, supra.* In this ruling, of course, I have applied the Supreme Court's definition of the law, and, accordingly, much of the discussion in the record of this case concerning the encephalopathy issue has become moot.

**6.** The legislative history confirms this interpretation of the statute, providing that "[s]imple similarity to conditions or time periods listed on the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation * * *." H.R.Rept. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 15 (reprinted in 1986 U.S.Code Cong. and Admin.News at 6356).

may be reasonable to conclude that a long-lasting "chronic" brain injury *was* caused by a DPT inoculation, but only in specific circumstances. He explained that such circumstances would occur when the child soon after the inoculation suffered a very extended seizure or other loss of consciousness lasting a number of hours, with immediately perceptible neurological consequences, from which the child never recovered or only slowly recovered over a period of at least weeks in duration.

Dr. Wiznitzer contrasted that hypothetical situation with this case, where Anju's seizures lasted a maximum of 15 minutes, no other loss of consciousness was reported, and, most importantly, there exists no evidence that she suffered any other immediate neurologic effects. She was not perceived, for example, to immediately have regressed in her development. Dr. Wiznitzer explained that the most likely explanation of Anju's situation is that high fevers caused by Anju's inoculations did "trigger" her seizures, simply. because the make-up of her brain was subject to seizures upon high fever, whereas in many children the same temperature would not trigger seizures. But he emphasized that there is no evidence that febrile seizures of the type and duration suffered by Anju can in turn cause permanent brain damage sufficient to account for her current mental status.[7]

 I simply found Dr. Wiznitzer's presentation on this issue to be quite persuasive, and consistent with what I have heard from other neurologists in Program cases. Dr. Wiznitzer is highly qualified, and respondent also offered extensive medical literature supporting his analysis. Finally, Dr. Armistead again made no real effort to refute any of Dr. Wiznitzer's analysis. Indeed, after hearing Dr. Wiznitzer, Dr. Armistead stated that he really did not take issue with any of Dr. Wiznitzer's testimony. Dr. Armistead simply did not explain the resulting self-contradiction in his testimony—*i.e.,* he did not explain how he could adhere to his own ultimate "causation" opinion in this case, while failing to take issue with any of Dr. Wiznitzer's contrary analysis.

In short, petitioner has wholly failed to carry his burden of showing that Anju's current mental retardation was "more probably than not" *caused by* any of her DPT inoculations.

## VI

### CONCLUSION

The story of Anju Agarwal's mental retardation is a tragic one. Her parents appear to be fine people, admirably devoted to Anju's welfare. Congress, however, designed the Program to compensate only those individuals who can demonstrate either a causal or temporal link between their injuries and a listed vaccination. In this case, the evidence simply does not demonstrate such a link. I thus decide that petitioner does not qualify for an award in this case.

---

**7.** Thus, petitioner did show that the inoculations did cause certain effects in Anju—*i.e.,* her febrile seizures. But because there was not evidence that these febrile seizures had any effect lasting at least *six months* (see § 300aa–11(c)(1)(D)(i)), there was no showing of an injury compensable under the Program.